1

2

3

4

5

6

7

8  **IN THE UNITED STATES DISTRICT COURT**

9  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  UNITED STATES OF AMERICA,                    CASE NO. CR F 09-0352 LJO

12                    Plaintiff-Appellee,        **DECISION ON APPEAL OF CRIMINAL**
                                                 **CONVICTION** (Doc. 8)
13        vs.

14  STEPHEN E. SCHAFFER,

15                    Defendant-Appellant.
    _____/
16

17                              **INTRODUCTION**

18        Defendant-appellant Stephen E. Schaffer ("Mr. Schaffer") appeals a decision of United States

19  Magistrate Judge S. Allan Alexander ("magistrate judge") that found him guilty of disorderly conduct

20  in violation of 36 C.F.R. §2.34(a)(1).  Mr. Schaffer argues that the magistrate judge erred as a matter of

21  law in three respects.  First, Mr. Schaffer argues that his conviction must be overturned because his

22  statement was not "public," as required by the statute and case law.  Second, Mr. Schaffer contends that

23  the magistrate judge erred by making no findings as to mens rea, although the statute requires intent to

24  cause public harm.  Third, Mr. Schaffer asserts that his statement, the sole basis of his conviction, is

25  protected by the First Amendment to the Unites States Constitution.  Because this Court finds that Mr.

26  Schaffer's statement was made in a private place, this Court REVERSES the magistrate judge's

27  conviction of Mr. Schaffer and REMANDS this action to the magistrate judge for further proceedings.

28  ///

                                              1

**BACKGROUND** [1]

**Housekeeping Camp**

In early August 2009, Mr. Schaffer and his family were on a family vacation at Housekeeping Camp in Yosemite National Park ("Yosemite").  Mr. Schaffer and his family rented 11 units that were clustered in a semi-circle at the edge of the camp near the Merced River.  Mr. Schaffer was staying in the J45 unit, which is connected to J46.

Housekeeping Camp cabins are duplex-like.  Each cabin contains two units.  Each unit consists of one sleeping area and one kitchen area.  The sleeping areas of the two units are separated by a wall in the middle of the cabin.  The kitchen areas on opposites ends of the cabin.  Each unit also has a fire pit outside.

The sleeping area of each unit is surrounded by three solid walls.  The fourth "wall" of each sleeping area consists of a a curtain that separates the sleeping area of the kitchen and its dining area.  There is one canvas roof that covers both units' kitchen areas and sleeping areas.

The covered kitchen area of each unit contains a dining table and a food preparation table equipped with an electrical outlet.  As noted above, one side of the kitchen area is adjacent to its sleeping area, separated by a curtain.  A wooden fence surrounds the other three sides of the kitchen area.  The wooden fence does not abut the solid walls enclosing the sleeping area on either side.  The gap between the fence and the sleeping area walls creates an opening on two sides.  One enters the unit through either of these gaps.

On the evening in question, Housekeeping Camp was full.  There were about 300 people in the campground.  There is a station at the entrance to the campgrounds.  Visitors must register and pay a fee to rent a unit and camp in the campgrounds.  The public may enter the campgrounds freely once they pass the registration booth at the entrance at any time of day, but visitors must register and pay for a unit to sleep at the campgrounds.  No one is permitted to sleep outside of a unit.  Housekeeping Camp has a "quiet time" curfew at 10:00 p.m.

///

---

[1]The facts are taken from the trial testimony and admitted exhibits, and are considered in a light most favorable to the prosecution. *United States v. Coutchavlis*, 260 F.3d 1149 (9th Cir. 2001).

### Events leading to investigation of Mr. Schaffer

On August 2, 2009 at 11:45 p.m., Ranger Shaun Cave, while on foot patrol, noticed a group of individuals at an amphitheater.  Ranger Cave called Ranger Ramon Vasquez, also on foot patrol, for assistance. Ranger Cave observed the group for a few minutes, announced his presence, introduced himself and engaged in a conversation.  Ranger Cave and Ranger Vasquez spoke with the group of six individuals for about twenty minutes at the amphitheater.

The group at the amphitheater was Mr. Schaffer's family.  One person told Ranger Cave that they were afraid to go back to their camp.  Mr. Schaffer's daughter-in-law, Misty Schaffer ("Ms. Shaffer"), explained to Ranger Cave that her father-in-law had been drinking Jack Daniels and there had been an altercation between Mr. Schaffer and one of his family members earlier in the day.  Ms. Schaffer was speaking to Mr. Schaffer's wife ("wife") on her cell phone.  Wife was in her car driving in Yosemite, but was lost.  Ranger Cave gave wife directions to Housekeeping Camp.

The rangers and Ms. Schaffer walked away from the amphitheater and toward a bridge that connected the amphitheater area to Housekeeping Camp.  Mr. Schaffer's unit was the closest to the bridge.  The rangers met wife on the bridge.  Wife appeared nervous and apprehensive.  Wife explained that she did not want Mr. Schaffer to know that she was back at Housekeeping Camp and that she wanted to leave.  Wife told the rangers that earlier in the day, Mr. Schaffer threatened to cut her up with a knife and slice her tires if she tried to leave.[2]

The rangers went to investigate Mr. Schaffer alone.  No family members crossed the bridge to join in the investigation.  The rangers called Ranger Stark for assistance before entering the J45 unit. Thus, three rangers proceeded to investigate Mr. Schaffer.

### Mr. Schaffer's Arrest

When the rangers arrived at Mr. Schaffer's unit, they found him sitting on bench of the table located inside of the kitchen area in his unit.  Mr. Schaffer was sitting with his back ramrod straight with

---

[2] Wife's statements–that she was scared, wanted to leave, and that her husband threatened to cut her with a knife and to slice her tires–were admitted over objections by defense counsel.  The government argued successfully that these statements were an exception to the hearsay exclusionary rule, because they were offered not as to their truth, but to explain the furtherance of the rangers' investigation.  Although admitted for this limited purpose, both the magistrate judge and the government impermissibly relied on the these statements for their truth.

1   his arms across his chest and his back against the table.  He was sitting in the dark and wearing his

2   backpack.  Ranger Cave could hear someone sleeping inside of the sleeping area of J45.

3       According to the rangers, Mr. Schaffer was calm and responsive.  When asked what he was

4   doing, Mr. Schaffer told the rangers that he was waiting for his son.  He told the rangers that if there was

5   a problem, he would leave.  Mr. Schaffer said that he wanted to take a bus out of Yosemite.  When

6   Ranger Cave informed Mr. Schaffer that the next bus did not leave until the morning, Mr. Schaffer

7   offered to camp outside of the campgrounds.  The rangers informed Mr. Schaffer that it was against

8   regulations to camp outside of the designated campgrounds.  According to Rangers Cave and Vasquez,

9   Mr. Schaffer then said that he "can't believe his family would do this to" him and asked the rangers to

10  take him to jail.  The rangers explained that they needed a reason to take someone to jail.  The rangers

11  further explained that they wanted to make sure it was safe for Mr. Schaffer's family to return to the

12  campsite.  According to the rangers, Mr. Schaffer replied: "If they called you guys on me, I'm going to

13  cut them up."

14      Ranger Vasquez placed Mr. Schaffer under arrest. Mr. Schaffer asked why he was under arrest.

15  The rangers explained that he was arrested for saying that he would cut up his family.  Almost

16  immediately, Mr. Schaffer attempted to revise his statement.   Mr. Schaffer told the rangers that he

17  meant to say that he was going to "cut them off," meaning that he would cut them off financially.

18  Ranger Vasquez and Ranger Cave both testified that they heard Mr. Schaffer initially say that he would

19  "cut them up," but then attempted to revise his statement to "cut them off."

20      Ranger Stark returned to the amphitheater to obtain a statement from Mr. Schaffer's family.

21  Ranger Stark obtains one witness statement.  The witness statement, however, contained no signature.

22      By all accounts, Mr. Schaffer was compliant, non-resistant, and calm.  Mr. Schaffer was taken

23  into custody without incident.  Consistent with the rangers' testimony, the Medical Screening Report

24  completed shortly after Mr. Schaffer was arrested described him as "alert, cooperative and relaxed."

25      Mr. Schaffer was issued two citations.  Citation 1853143 charged Mr. Schaffer with disorderly

26  conduct in violation of 36 C.F.R. §2.34(a)(1).  Citation 1853144 charged Mr. Schaffer with being under

27  the influence of alcohol in violation of 36 C.F.R. §2.35(c).  At an initial appearance, Mr. Schaffer

28  entered a plea of not guilty as to each citation.

**Mr. Schaffer's Conviction**

On August 26, 2009, the magistrate judge conducted a court trial.  The magistrate judge found Mr. Schaffer guilty of disorderly conduct but not guilty of being under the influence of alcohol.  The court sentenced Mr. Schaffer to unsupervised probation for a term of six months and imposed a fine and assessment of $560.  Mr. Schaffer filed a notice of appeal from his conviction and sentence for disorderly conduct on September 8, 2009.

<u>S</u>TANDARD <u>O</u>F <u>R</u>EVIEW

This Court reviews a trial court's legal conclusions de novo. *In re Complaint of McLinn*, 739 F.2d 1395, 1398 (9th Cir. 1984).  The Court reviews a magistrate judge's findings of fact under a sufficiency of the evidence standard.  *United States v. Coutchavilis*, 260 F.3d 1149 (9th Cir. 2001).  In reviewing the sufficiency of the evidence, "the critical inquiry...is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. McGuire*, 968 F.2d 1222 (9th Cir. 1992) (quoting *United States v. Thomas*, 887 F.2d 1341, 1343 (9th Cir. 1989)).  The Court interprets an administrative regulation de novo. *United States v. Albers*, 226 F.3d 989, 994 (9th Cir. 2000).

<u>D</u>ISCUSSION

**Whether Mr. Schaffer's statement to the rangers in the kitchen area of his unit was "public"**

Mr. Schaffer appeals his 36 C.F.R. §2.34(a)(1) conviction, contending that his statement that he would "cut up" his family was not "public."  Pursuant to 36 C.F.R. §2.34(a)(1), "[a] person commits disorderly conduct when, with intent to cause public harm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person...engages in fighting or threatening, or in violent behavior."  "The purpose of this regulation is to 'conserve scenery, natural and historic objects, and wildlife, and to provide for the enjoyment of those resources in a manner that will leave them unimpaired for the enjoyment of future generations.'" *United States v. Taylor*, 258 F.3d 1065, 1067 (9th Cir. 2001) (quoting 36 C.F.R. §1.1(b)).  Accordingly, the federal "disorderly conduct statute requires a public component to the proscribed behavior" as the word "public" modifies harm, nuisance, jeopardy and violence. *Taylor*, 258 F.3d at 1068.

In ruling that the public component satisfied, the magistrate judge found that:

the area outside the sleeping area at this campsite was a common area based on the testimony by Ranger Caves [sic] that it is regularly patrolled for food violations and that it is distinguishable from the sleeping area, which would not be patrolled. So I do think that the public portion of this regulation has been met.

Mr. Schaffer points to companion cases, both issued in August 2001 by the United States Courts of Appeals for the Ninth Circuit, that consider whether behavior is "public" within the meaning of 36 C.F.R. §2.34. In arguing that the public element is not satisfied, Mr. Schaffer argues that the facts of this case are similar to those in *United States v. Taylor*, 258 F.3d 1065 and distinguishable from *United States v. Coutchavlis*, 260 F.3d 1149 (9th Cir. 2001).

In *Taylor*, 258 F.3d 1065, the appellate court affirmed the district court's finding that conduct inside the sleeping area of a cabin with no civilians nearby does not satisfy the required public component of the statute. In *Taylor*, a ranger determined to investigate Mr. Taylor at Lost Arrows Cabins in Yosemite. The ranger knocked on Mr. Taylor's cabin door. Receiving no response, the ranger entered Mr. Taylor's ajar cabin door to find Mr. Taylor lying on his bed in his cabin with his eyes closed. The ranger poked Mr. Taylor in the chest and chin, arousing Mr. Taylor, and demanded to see some identification. Mr. Taylor reacted with profanity, eliciting a profane response from the ranger. When Mr. Taylor attempted to rise from his bed, the ranger tackled Mr. Taylor and threw him to the ground. Mr. Taylor struggled and he was subdued. Mr. Taylor was arrested for disorderly conduct and being under the influence of alcohol. Upon these facts, the trial court found that the conduct was private because the "incident occurred totally within Taylor's cabin. The officer and Taylor were the only people in the cabin. Although two officers were outside, no other civilian was within 100 feet of the cabin." *Id*. at 1066. Since the behavior was not public, "then offense [of disorderly conduct] isn't committed." *Id*. at 1066-67.

By contrast, in *United States v. Coutchavlis*, 260 F.3d 1149 (9th Cir. 2001), the appellate court found that activity inside a car that was driving on a public road inside Yosemite did constitute a public act under 36 C.F.R. §2.34(a). Mr. Coutchavlis was driving his car to Glacier Point with his "sometime girlfriend" when the two got into an argument. *Id*. at 1152. Mr. Coutchavilis, "while driving, punched the windshield of the car, lengthening a pre-existing crack. He also grabbed [his friend's] arm and activated the electronic door locks to keep her from leaving the car, and continued to drive." *Id*. Later

6

that month, Mr. Coutchavilis was arrested for disorderly conduct based on the Glacier Point drive. In considering whether the actions inside a car on the public road caused public harm, the appellate court considered the Model Penal Code definition of "public," as adopted by the Ninth Circuit in *Taylor*, 258 F.3d at 1068 and *Albers*, 226 F.3d at 995. According to that definition, "'[p]ublic' means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood." Model Penal Code §250.2 (cited in *Coutchavilis*, 260 F.3d at 1154). The conduct in *Coutchavilis* fell "squarely within the Model Penal Code definition of 'public'" because the conduct took place on the highway. *Id*. In addition, Mr. Coutchvilis acted "recklessly" in created a risk of public harm, because the conduct that took place while traveling on a public road and there was a risk to the incident could have resulted in a crash. *Id*.

In her conclusion, the magistrate judge determined that the kitchen area of Mr. Schaffer's unit was a "common area" based on Ranger Cave's testimony that he patrols the kitchen area of the Housekeeping Camp units for food storage violations. Whether a ranger patrols an area of a rented cabin for a violation, however, is irrelevant to the public inquiry. To determine whether a defendant's conduct created a risk of public harm for purpose of the disorderly conduct regulation, "the issue is ...whether the act took place in a location that is accessible to the public." *Coutchavilis*, 260 F.3d at 1155. A defendant cannot be convicted of disorderly conduct in a national park under this federal regulation where the public is not involved at all. *Id*.; *United States v. Malone*, 822 F.Supp. 1187 (E.D. Pa.1993). The presence of rangers does not satisfy this element. *See Taylor,* 258 F.3d 1065 (statements made inside Yosemite cabin were private despite the presence of rangers); *Malone*, 822 F.Supp. 1187 (defendant could not be convicted of disorderly conduct based on obscene gesture or creating hazardous or physically offensive condition, where public was not involved at all but only defendant and undercover officer). The magistrate judge made failed to consider whether the public or a substantial group had access to Mr. Schaffer's rented, covered kitchen area. Accordingly, based on the standard set forth in *Coutchavilis*, the magistrate judge erred as a matter of law in her conclusion that the kitchen area of the Housekeeping Camp unit was public, based solely on the ranger's statement that he patrols the

1  kitchen area of the units for food storage violations.[3]

2        Moreover, even when viewing the evidence in a light most favorable to the prosecution, the

3  Court finds that a rational trier of fact could not have found that the kitchen area was public.  The

4  magistrate judge's conclusion that the kitchen area of J45 was a "common area" in the public park was

5  unsubstantiated by the evidence.  To the contrary, the rangers indicated in their testimonies that the

6  kitchen area of the units are not public; to wit: the kitchen area is enclosed and covered by the same roof

7  as the sleeping area;  the kitchen area was separated from the rented sleeping area by a curtain; each

8  rented unit has a kitchen area attached to it; Ranger Cave testified that although members of the public

9  wander through Housekeeping Camp during the day, they do not wander through the kitchen areas of

10  the rented units; Ranger Vasquez testified that he had never received a report of an uninvited person

11  walking through the kitchen area of a rented cabin; Ranger Vasquez acknowledged that "when

12  somebody has paid for the use of J45 for the night, other people can't just go in there and use that

13  campsite"; Ranger Vasquez would respond to a call if a member of the public walked into a rented

14  campsite without permission; and Ranger Cave testified that it was not common for the public to wander

15  through the kitchen of someone else's cabin.  The contrast as to what areas were public or private was

16  made clear by Ranger Vasquez who testified that while there were no restrictions to public access to the

17  campground, the bridge, the river, the amphitheater, and the park, the public would not be able to go into

18  a unit that someone else had paid for.  In addition, it is undisputed that the sleeping area of the unit is

19  private.  Photographs of the kitchen area admitted as evidence at trial demonstrate that the kitchen area

20  is connected to, and reserved for, the rented unit.  Thus, the government provided insufficient evidence

21  that the public or a substantial group of people had access to the covered kitchen area that was connected

22  to Mr. Schaffer's unit.

23        The government argues that *Taylor* is distinguishable because a family member was present in

24  the cabin.  In addition, the government speculates that some of the approximately 300 people at

25  Housekeeping Camp could have been wandering outside to hear Mr. Schaffer's statement.  The

26

27     [3] Ranger Cave testified that while he would not patrol the sleeping area of the unit, he patrols the kitchen area for food storage violations.  Neither party addressed whether Ranger Cave's patrol of the unit's kitchen area is activity that falls

28  within the Fourth Amendment's protection against improper searches and seizures.

government's points–the second of which is unsubstantiated and unsupported by the evidence–are irrelevant.  The *Coutchavilis* court ruled that "the issue is *not* whether the public actually witnessed the act, but rather whether the act took place in a location accessible to the public." *Id*. at 1154 (emphasis added).  Thus, even if a family member was present or a stray member of the public was walking by, the issue is whether the public has access to the kitchen area.  As discussed above, there was insufficient evidence to support that finding.  *See, Commonwealth v. Lawson*, 759 A.2d 1(Pa. Super. 2000) (a defendant who supplied minors with alcohol at a party in his apartment was not in a "public" place within the meaning of the Model Penal Code definition of public; defendant's party was only open to the renters of the apartment and their invited guests, and the court would not extend definition of "public" to encompass the group, even if the number of guest totaled twenty or thirty persons.).

Although "a national park is the quintessential public place," *United States v. Maher*, 902 F.Supp. 560, 565 (E.D. Penn. 1995), the public does not have unfettered access to a person's private, reserved area inside of the public park.  Having considered the evidence and the case law, this Court finds since Mr. Schaffer's behavior lacked a public character.  Because Mr. Schaffer's statement was made in a private place, "then [his] offense isn't committed." *Taylor,* 258 F.3d at 1066-67. *C.f. United States v. Albers*, 226 F.3d 989 (9th Cir.), *cert. denied*, 121 S.Ct. 859, 531 U.S. 1114 (2000) (defendants who engaged in BASE jumps from peaks in national park recklessly created a risk of public alarm, nuisance, jeopardy, or violence, through creation or maintenance of a hazardous condition, as required to support convictions for disorderly conduct under administrative regulation governing conduct in national parks; activity occurred in a public place, and, while primary safety threat implicated in BASE jumping was to jumper, BASE jumping also posed risks to public at large); *Coutchavlis,* 260 F.3d 1149 (risk of public harm where defendant is traveling on public highway and behaved in a way that could have resulted in a crash on the public highway); and *United States v. Lanen*, 716 F.Supp. 208 (1986) (defendant's exposure was public, and thus constituted disorderly conduct, where it occurred in an open stall in a public restroom), *with Taylor, supra* (public requirement not satisfied when defendant makes statements to ranger while in the sleeping area of his cabin).

1 | **Whether Mr. Schaffer's statement was protected by the First Amendment[4]**

2       Mr. Schaffer contends that his disorderly conduct conviction, based solely on his statement,

3 violates his First Amendment right to free speech.  Mr. Schaffer argues that a conviction based on his

4 statement is limited by First Amendment jurisprudence.  Moreover, Mr. Schaffer maintains that his

5 statement does not qualify as an exception to the First Amendment speech protections.  As explained

6 below, this Court agrees that Mr. Schaffer's 36 C.F.R. § 2.34(a)(1) fails to satisfy the free speech

7 limitations to the federal disorderly conduct regulation.[5]

8       Mr. Schaffer points out that although he was cited and convicted of disorderly conduct based on

9 his statement, he was not charged with the one provision of the disorderly conduct regulation that

10 specifically proscribes using "*language...that is* obscene, *physically threatening* or menacing, or done

11 in a manner that is likely to inflict injury or incite an immediate breach of the peace." 36 C.F.R.

12 §2.34(a)(2).  Instead, Mr. Schaffer was cited and convicted of the section of the regulation that

13 proscribes "fighting or *threatening*, or...violent *behavior*." 36 C.F.R. §2.34(a)(1).  The government

14 cannot avoid the First Amendment restrictions on criminalizing speech, however, by charging Mr.

15 Schaffer under a different subsection.

16       In *United States v. Poocha,* 259 F.3d 1077, 1080 (9th Cir. 2001), the Ninth Circuit determined

17 that 36 C.F.R. §2.34(a)(2) does not criminalize impermissibly speech protected by the First Amendment

18 to the United States Constitution because the statute:

19
20
21
22
23
> closely tracks, in part the words of the historic Supreme Court in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), in which the Court described the type of language that may be legally proscribed by the government–specifically classes of speech "which by their very utterance inflict injury or tend to incite an immediate breach of the peace."  The one federal decision construing §2.34(a)(2) that we found notes that "[t]he statute is designed to prohibit speech that incited violence, or 'presents a clear and present danger'...[t]his statute covers what are known as 'fighting words' and 'incitement to riot.'" *United States v. Chung Lee*, 1991 WL 193422, at *2 (E.D. Pa. Sept. 20, 1991).  Because the regulation proscribes only that

24
25
26
[4] Although this Court reverses Mr. Schaffer's conviction because his statement was not public, this Court considers Mr. Schaffer's constitutional argument in the alternative.  This Court does not reach Mr. Schaffer's argument related to mens rea.

27
28
[5] The magistrate judge did not make findings on the record regarding whether the statement constituted protected speech.  Mr. Schaffer's counsel cited to *United States v. Poocha*, in his memorandum and mentioned *Poocha* in his closing argument.  Accordingly, based on Mr. Schaffer's conviction, this Court assumes that the magistrate judge considered and rejected Mr. Schaffer's First Amendment arguments.

1    speech that stands beyond the constitutional bourn, Poocha's appeal requires us to
2    determine whether the speech of which he was convicted falls within the parameters of
     the First Amendment, or whether it does not and it is covered by the regulation.

3    *Poocha*, 259 F.3d at 1080. Although the language of 36 C.F.R. §2.34(a)(1) does not include explicitly

4    the limiting language of 36 C.F.R. §2.34(a)(2), this Court finds that a conviction under §2.34(a)(1) must

5    be based on a statement that "stands beyond the constitutional bourn." *Id*.; *see also, Watts v. United*

6    *States*, 394 U.S. 705, 707 (1969) (a "statute...which makes criminal a form of pure speech, must be

7    interpreted with the commands of the First Amendment clearly in mind.  What is a threat must be

8    distinguished from what is constitutionally protected speech.").   Accordingly, this Court must consider

9    "whether the speech of which he was convicted falls within the parameters of the First Amendment, or

10   whether it does not and it is covered by the regulation." *Poocha*, 259 F.3d at 1080.

11   Mr. Schaffer successfully argues that this statement is no exception to the First Amendment

12   protection to free speech, as his statement does not fall into the category of "fighting words."   "To

13   characterize speech as actionable 'fighting words,' the government must prove that there existed 'a

14   likelihood that the person addressed would make an immediate violent response.'" *Poocha*, 259 F.3d

15   at 1080-81 (quoting *Gooding v. Wilson*, 405 U.S. 518, 528 (1972)).  Here, there is insufficient evidence

16   that the person addressed would make an "immediate and violent response" for two reasons.  First,

17   courts apply a "narrower application" to the fighting words exception when the person addressed in a

18   law enforcement official, "because a properly trained officer may reasonably be expected to exercise a

19   higher degree of restraint than the average citizen and thus be less likely to respond belligerently to

20   fighting words." *Poocha*, 259 F.3d at 1081 (quotations and citations omitted).  It is an unreasonable

21   inference to expect the rangers to react immediately and violently to Mr. Schaffer's statement, because

22   they exercise a higher degree of restraint.  Moreover, Mr. Schaffer did not direct the statement at the

23   rangers.  Accordingly, it was not reasonably foreseeable that Mr. Schaffer's statement would incite the

24   rangers.  Second, Mr. Schaffer's statement was directed at his family, and his family was not present.

25   As the rangers testified, the individuals with whom Mr. Schaffer had an altercation were at the

26   amphitheater, outside of the campground and across the bridge from his J45 unit.  Because there was

27   no evidence that any family members heard Mr. Schaffer's statement, there is insufficient evidence that

28   there was a likelihood that the person addressed would respond immediately and violently to Mr.

11

1   Schaffer's statement. *See, Poocha*, 259 F.3d 1077 (defendant's words directed to ranger, in reaction to

2   ranger's attempt to arrest him, was constitutionally protected speech, and thus did not violate federal

3   disorderly conduct regulation, even if such speech was accompanied by defendant clenching his fists and

4   sticking out his chest, inasmuch as such speech did not constitute "fighting words," and was neither

5   intended nor likely to incite crowd at scene to riot.).  Accordingly, Mr. Schaffer's statement does not

6   qualify as "fighting words."

7        Similarly, Mr. Schaffer's statement fails to qualify as a "true threat."   A "true threat" occurs

8   when "a speaker directs a threat to a person or group of persons with the intent of placing the victim in

9   fear of bodily harm or death." *United States v. Cassel*, 408 F.3d 622, 631 (9th Cir. 2005).  According

10  to this definition, speech that causes "reasonable person [to] foresee that the listener will believe that he

11  will be subjected to physical violence upon his person, is unprotected by the First Amendment." *United

12  States v. Orozco-Santillan*, 903 F.2d 1262, 1265-66 (9th Cir. 1990), overruled on other grounds as

13  recognized in *United States v. Hanna*, 293 F.3d 1080 (9th Cir. 2002).  The government argues that

14  whether a statement is a true threat is "governed by an objective standard–whether a reasonable person

15  would foresee that the statement would be interpreted by those to whom the maker communicates the

16  statement as a serious expression of intent to harm or assault." Appellee's Brief at 13( citing *United

17  States v. Mitchell*, 812 F.2d 1250, 1255-56 (9th Cir. 1987).  Under this objective standard, however,

18  there is insufficient evidence that Mr. Schaffer's statement constituted a true threat.  Because the

19  statement was directed at his family, and not at the rangers, a reasonable person would not foresee that

20  the statement was a serious expression of intent to harm or assault the listener.  Put another way, a

21  reasonable person would not foresee that the ranger would believe that he would be subjected to physical

22  violence upon *his person* based on Mr. Schaffer's statement that he would "cut up" his family.

23  Accordingly, Mr. Schaffer's statement does not fall within the "true threat" exception to the First

24  Amendment free speech protection.

25       Because Mr. Schaffer's statement failed to constitute "fighting words" and was not a "true

26  threat," it was protected by the First Amendment.  His disorderly conduct conviction based solely on his

27  statement made to the rangers must be overturned.

28  ///

1

## CONCLUSION AND ORDER

2      For the reasons discussed above, this Court REVERSES and REMANDS this action to the

3  magistrate judge for further proceedings consistent with this opinion.

4      IT IS SO ORDERED.

5  **Dated:    January 29, 2010**              /s/ Lawrence J. O'Neill
                                      UNITED STATES DISTRICT JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28